Victor J. Sandoval
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd. Suite 1121
Los Angeles, California 90034
(562) 534-5907
victor@almeidalawgroup.com

[Additional Counsel on Signature Page]

*Counsel for Plaintiff & Proposed Classes*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHERINE GONZALEZ, *on behalf of herself and all others similarly situated,*<br><br>Plaintiff,<br><br>vs.<br><br>WORKWISE SOLUTIONS INC., d/b/a BANDANA JOBS,<br><br>Defendant. | Case No. 2:26-cv-5959<br><br>**CLASS ACTION COMPLAINT**<br><br>1. VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2511, *ET SEQ.*<br>2. VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 631<br>3. VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 632<br>4. VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349<br>5. INTRUSION UPON SECLUSION<br>6. INVASION OF PRIVACY<br>7. BREACH OF CONTRACT<br>8. BREACH OF IMPLIED CONTRACT<br>9. UNJUST ENRICHMENT<br><br>**DEMAND FOR JURY TRIAL** |

-1-

CLASS ACTION COMPLAINT

Plaintiff Katherine Gonzalez, individually and on behalf of all others similarly situated, brings this class action lawsuit against Defendant Workwise Solutions Inc. d/b/a Bandana Jobs ("Bandana," or "Defendant"), and alleges the following based upon personal knowledge as to herself and her actions, knowledge, and experiences, and upon information and good faith belief as to all other matters.

**INTRODUCTION**

1. This class action lawsuit challenges Bandana's practice of secretly intercepting and transmitting the private communications, job-search activity, and personal data of the users of its website and mobile application, www.bandana.com and the Bandana iOS/Android applications (collectively, the "Platform"), to undisclosed third parties including Google LLC ("Google"), Meta Platforms, Inc. ("Meta" or "Facebook"), TikTok USDS Joint Venture, LLC ("TikTok") and Fullstory, Inc. ("Fullstory") (together, the "Tracking Technologies") without the knowledge or consent of its users.

2. Bandana operates an online and mobile job-search marketplace that connects employees with employers.

3. Bandana's users are job seekers. In using the Platform, these users provide economically and personally sensitive information including their employment history (including gaps and reasons for job loss), current employment status, desire to find a new job, the specific jobs they are looking for, the salaries they are willing to accept, their geographic location, commute preferences, employment-related disabilities, and more (collectively, the "Sensitive Information").

4. Users of the Platform reasonably expect that the Sensitive Information that they provide to Bandana will remain private and confidential, visible only to Bandana and to the employers to whom the users have chosen to apply.

5. That expectation is reinforced by Bandana itself. In the privacy policy it displays on its website (the "Privacy Policy"), Bandana affirmatively represents that

CLASS ACTION COMPLAINT

it shares personal information only with narrow categories of recipients—"Service Providers" who process data "on behalf of the Company," "Affiliates," "business partners," "other users" in public areas, and, otherwise, only "With Your consent."

6.    At no point does Bandana' Privacy Policy disclose that it transmits users' Sensitive Information to Google or Meta for advertising, analytics, and/or profiling purposes.[1]

7.    These assurances—and the Privacy Policy's silence regarding Google, Meta, and other third parties—are false and misleading.

8.    Unbeknownst to users, Bandana embeds Platform third-party tracking technologies in the Platform including the Google Analytics SDK and tracking code, the Meta/Facebook Pixel and Facebook Software Development Kit ("Facebook SDK"), the TikTok Business SDK, and Fullstory session replay tools that secretly intercept and transmit, in real time, the contents of users' job searches and application activity, along with unique persistent identifiers, to third parties for advertising, analytics, and profiling purposes.

9.    Each time a Plaintiff or Class member views a specific job listing on the Platform, the embedded Tracking Technologies simultaneously transmit to Google, Meta, and other third parties: (a) the precise URL of the job listing (which is a unique page identifying a single job opening at a single employer); (b) the full title of the job listing, including the employer's name, the position being applied for, and in many cases the street address of the job; (c) a persistent client identifier that uniquely identifies the user's browser or device across sessions; and (d) granular engagement data such as how far the user scrolled on the listing and whether the user submitted an application.

10.    These transmissions occur without any notice to the user and without the user's consent.

---

[1] *Privacy Policy*, https://bandana.com/privacy (last visited Apr. 30, 2026).

CLASS ACTION COMPLAINT

11.   These transmissions, when aggregated, disclose an extraordinarily sensitive portrait of each user, including:

    a.   The specific employers the user is considering;

    b.   The specific positions the user is pursuing;

    c.   The user's willingness to leave his or her current employer;

    d.   The user's industry, geography, seniority, and compensation range;

    e.   The frequency and intensity of the user's search; and

    f.   The specific positions a user actually applied to.

12.   Google, Meta, and other third parties then combine this information with the comprehensive profiles they already maintain about each user from their own services and from the millions of other applications and websites in which Google, Meta, and other third parties tracking code is embedded, to build, refine, and monetize cross-platform behavioral profiles that are then offered to third-party advertisers.

13.   The nonconsensual disclosure or mishandling of this data can cause concrete and irreversible harm. Employment status and job-search activity are information that job seekers have compelling reasons to keep confidential: disclosure can alert a current employer to a search, distort negotiation leverage, expose the user to retaliatory or discriminatory targeting, and—as has been repeatedly demonstrated in the employment and lending contexts—enable discriminatory ad delivery that narrows, rather than expands, a user's economic opportunities. Because job-search data touches on the economic autonomy of the individual, Defendant's obligation to safeguard it was correspondingly grave.

14.   Bandana's secret interception and transmission of users' private communications and personal information to Google, Meta, and other third parties violates the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511, 2520 ("ECPA"); the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA"); the New York General Business Law § 349; and constitutes intrusion upon

-4-

CLASS ACTION COMPLAINT

seclusion, invasion of privacy, breach of contract, breach of implied contract, and unjust enrichment.

## PARTIES

15. Plaintiff Katherine Gonzalez is a natural person who, at all times relevant to this litigation, has resided (and continues to reside) in Los Angeles County, California.

16. Defendant Workwise Solutions Inc., doing business as Bandana Jobs, is a Delaware corporation headquartered at 105 N 13th Street, Floor 3, Office #6 in Brooklyn, New York, 11249.

17. Defendant owns and operates the website www.bandana.com and the Bandana mobile application, through which it transacts business with users residing throughout the United States, including in California.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) this is a class action lawsuit in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) there are more than 100 members of the proposed class; and (c) at least one member of the proposed class, including Plaintiff, is a citizen of a State (California) different from Defendant (New York/Delaware).

19. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises in part under the laws of the United States, specifically the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511, 2520. The Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

20. This Court has personal jurisdiction over Defendant because it has purposefully availed itself of the privilege of conducting business in California by operating its Platform as a nationwide job-search marketplace accessible to California residents, by publishing its mobile applications on Apple's iOS App Store

-5-

CLASS ACTION COMPLAINT

and Google's Play Store for download by California residents, by hosting and displaying advertisements for employment positions located in California and seeking to fill California positions, and by directing its business activities toward California users, including Plaintiff.

21. Defendant's tortious conduct, including its embedding of the Google and Facebook Tracking Technologies within the Platform to intercept the communications of California users, caused injury to Plaintiff in California. Defendant's contacts with the forum are such that it should reasonably anticipate being haled into court in this District.

22. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Plaintiff's use of the Platform, the interception and transmission of Plaintiff's Sensitive Information through the embedded Tracking Technologies, and the resulting injuries Plaintiff sustained.

## FACTUAL ALLEGATIONS

### *A.    Bandana's Platform and Its Users.*

23. Bandana operates a nationwide online and mobile job-search tool through the Platform. Bandana, through the Platform, allows users to search a database of millions of job listings by title, employer, keyword, and location; to view the details of individual job listings; and to apply to positions directly through the Platform.

24. Bandana holds itself out as a consumer-facing service for job seekers and markets itself under the tagline "Find Better Jobs." Its services are offered to users at no charge; the Company monetizes the Platform through payments from employers who pay to post jobs through an affiliated portal at business.bandana.com, and through advertising and analytics relationships that the Company has not disclosed to its users.

CLASS ACTION COMPLAINT

25. To use the Platform's full functionality, including saving jobs, applying to jobs, and receiving job-match notifications—a user is required to create an account. As part of the registration and profile-completion process, Bandana collects personally identifying information from users, including the user's first and last name, email address, telephone number, physical address (including state, city, and ZIP code), and employment history, as well as device identifiers and other technical data. [2]

26. Even without creating an account, however, users who simply browse the Platform engage in private communications with Bandana. Each time a user loads a specific job listing, the user's browser or mobile application transmits a request to Bandana's servers identifying the specific listing the user wishes to view, and Bandana's servers return the listing's content—the job title, the employer, the job description, the location, the compensation, and related fields. The URL of the listing itself is a unique identifier that maps one-to-one to a single job opening at a single employer.

27. The content of a user's engagement with the Platform—including which employers the user is researching, which positions the user is interested in, how long the user considers each listing, whether the user scrolls through the full description, and whether the user applies—is the kind of information that a reasonable user would expect to remain confidential between the user and Bandana.

28. Job-search activity is widely recognized to be among the most sensitive categories of personal information: the fact that a person is searching for a job, the specific industry, seniority, and compensation level the person is targeting, and the identity of the employers the person is considering, each carries significant economic and reputational implications, and each can cause substantial harm if disclosed to a current employer, competitor, or unrelated third party.

---

[2] *Our Mission*, https://bandana.com/about (last visited Apr. 30, 2026).

-7-

CLASS ACTION COMPLAINT

29. Following the 2023 expiration of the California Consumer Privacy Act's temporary employment-related exemption, *see* Cal. Civ. Code § 1798.145(m)(4), businesses collecting information from job applicants became subject to notice-at-collection requirements. *See* Cal. Civ. Code § 1798.100(a). Accordingly, entities collecting applicant and recruiting-related information must provide notice, at or before the point of collection, identifying the categories of personal information collected and the purposes for which such information will be used, *see* Cal. Civ. Code § 1798.100(a)(1), and must further disclose the categories of third parties to whom such information is disclosed, shared, or otherwise transmitted, *see* Cal. Civ. Code §§ 1798.110(c)(4), 1798.130(a). These requirements reflect California's recognition that applicant and employment-seeking information constitutes sensitive and protected personal information subject to transparency and privacy obligations.

30. Federal agencies have also recognized that online and mobile job-search activity is sensitive data whose unauthorized use or sharing can cause material harm.

31. The Federal Trade Commission, the Equal Employment Opportunity Commission, and the Consumer Financial Protection Bureau have all flagged the risks posed by advertising platforms' collection of employment and job-search signals, including the risk that such data is used to deliver discriminatory employment advertising and to narrow, rather than broaden, the economic opportunities shown to particular classes of users.[3]

//

//

//

---

[3] *Joint Statement on Enforcement Efforts Against Discrimination and Bias in Automated Systems*, EEOC, CRT, FTC, and CFPB (Apr. 25, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/joint-statement-enforcement-efforts-against-discrimination-bias-automated-systems

-8-

CLASS ACTION COMPLAINT

**B.**      ***Bandana's Secret Use of Google, Facebook, and Other Third-Party Tracking Technologies.***

32.      Unbeknownst to its users, Bandana has embedded within its Platform third-party tracking code and SDKs that intercept, copy, and transmit to Google, Meta, and TikTok the contents of users' private communications with Bandana— including, most significantly, the specific job listings users view, and the specific applications users submit.

33.      These third-party tools operate silently, in the background, without any visible indication to the user, and without any mechanism by which the user can consent to or opt out of them before they begin transmitting data.

**i.**      ***The Google Tracking Technology.***

34.      Google Analytics is a web-analytics service operated by Google LLC that enables website and mobile-application operators to collect granular data about user interactions with their properties, including page views, clicks, scrolls, form submissions, and purchases. Google Analytics is typically deployed via a snippet of JavaScript (on web properties) or a Google Analytics for Firebase/Google Mobile Ads SDK (on mobile properties), often in conjunction with Google Tag Manager, which allows operators to deploy multiple tracking tags from a single container.[4]

35.      By default, Google Analytics assigns each user a persistent unique client identifier ("cid"), which Google stores in a first-party cookie on the website domain (for web) or in persistent device storage (for mobile). This client identifier enables Google to link every page view, event, and interaction that a user performs on a given property to a single persistent identity, and—when combined with Google's own account ecosystem and the millions of other properties that deploy Google Analytics—to identify the user across sessions, devices, and properties.[5]

---

[4] *See Help Center*, https://support.google.com/analytics (last visited Apr. 30, 2026).

[5] *See [GA4] Data collection*, Google Analytics Help,

-9-

36.    When Google Analytics is deployed on a website or mobile application, each page view or event triggers a network request from the user's device to Google's collection endpoints at *.google-analytics.com, *.analytics.google.com, and related Google-operated domains.

37.    That request carries, among other data: (a) the Google Tag ID of the property ("tid"); (b) the persistent client identifier ("cid"); (c) the full URL of the page the user is viewing ("dl"); (d) the full title of the page ("dt"); (e) the screen resolution and viewport of the device; (f) the language and timezone; (g) the event name ("en") being transmitted (for example, "page_view," "scroll," "click," or "generate_lead"); and (h) event parameters describing the event in detail. These parameters are configurable by the operator and are routinely used, as Bandana uses them, to capture granular behavioral signals such as how far a user scrolled on a page ("epn.percent_scrolled").[6]

38.    Once data is received at Google's collection endpoints, Google does not simply store that data for the operator's internal analytics.

39.    Rather, Google uses that data (a) to power its Google Ads and Google Marketing Platform advertising products, including for audience building, retargeting, and cross-property profiling; (b) to improve its own machine-learning models; and (c) to associate the user's activity on the operator's property with the user's identity on Google's own services, including Search, YouTube, Gmail, Maps, and the Android operating system.[7]

---

https://support.google.com/analytics/answer/11593727 (last visited Apr. 30, 2026) ("Google Analytics stores a client ID in a first-party cookie named _ga to distinguish unique users and their sessions on your website.").

[6] *See [GA4] Measurement Protocol Reference*, Google Analytics Developer Guide, https://developers.google.com/analytics/devguides/collection/protocol/ga4 (last visited Apr. 30, 2026).

[7] *See Google Marketing Platform*, https://marketingplatform.google.com/about/

-10-

CLASS ACTION COMPLAINT

40. As seen above, Bandana has deployed Google Analytics (Google Analytics 4, or "GA4") on its Platform. Network traffic captured from a user's interaction with the Bandana mobile experience confirms that, when a user views a specific job listing, the user's device transmits to Google's servers, among other fields:

    a. a Google Tag ID ("tid") of "G-KE145EJ7JF," which is Bandana's unique Google Analytics property identifier;

    b. a persistent Google Analytics client identifier ("cid") of "1932177039.1773347205," which uniquely identifies the user across sessions and across the Platform;

    c. the document location ("dl") "https://bandana.com/m/jobs/47f1a5c5-4a12-4eb8-b3f1-c42181cf625a," which is the unique URL of the specific job listing the user is viewing;

(last visited Apr. 30, 2026); Connect Google Ads to Google Analytics, Google Analytics Help, https://support.google.com/analytics/answer/9379420 (last visited Apr. 30, 2026).

-11-

CLASS ACTION COMPLAINT

d. the document title ("dt") "BMO Harris Bank Jobs – Analyst, Global Markets Corporate Banking – 320 S Canal St, West Loop," which discloses the employer's name (BMO Harris Bank), the specific position being viewed (Analyst, Global Markets Corporate Banking), and the street address of the position (320 S Canal St, West Loop);

| | |
|---|---|
| cid | 1404557358.1777473100 |
| frm | 0 |
| pscdl | noapi |
| rcb | 17 |
| sr | 171x613 |
| uaa | |
| uab | 64 |
| uafvl | Google%20Chrome;147.0.7727.102\|Not.A%2FBrand;8.0.0.0\|Chromium;147.0.7727.102 |
| uam | Nexus 5 |
| uamb | 1 |
| uap | Android |
| uapv | 6.0 |
| uaw | 0 |
| tag_exp | 0~115938466~115938468~117266400~117512542~118167058~118289195 |
| sid | 1777473099 |
| sct | 1 |
| seg | 1 |
| dl | https://bandana.com/jobs/940faf3e-935b-451f-8d3a-8340577a1e23 |
| dr | https://bandana.com/ |
| dt | H&R Block Jobs - Remote Tax Professional - 1523 W North Ave, |
| en | page_view |
| _ee | 1 |
| tfd | 5467 |

e. an event name ("en") of "scroll," capturing the user's engagement with the listing;

f. an "epn.percent_scrolled" parameter of "90," disclosing that the user has scrolled approximately ninety percent of the way through the listing;

g. a session identifier ("sid"), session count ("sct"), and engagement flag ("seg") that disclose the frequency and depth of the user's visits; and

h. device characteristics, including screen resolution ("sr"), language ("ul"), and the user agent of the Bandana mobile application ("BandanaApp-Bandana/415E148" running on "iPhone OS 18_7").

41. Likewise, Google Analytics is set up on the Website to capture users' individually identifiable CID along with the name and location of each job they view through the Platform, as seen below.

-12-

CLASS ACTION COMPLAINT

42. This transmission occurs in real time and without any intervening notice to the user.

43. At the moment the user requests a job listing from its servers, Bandana's embedded Google Analytics code simultaneously transmits the contents of that request (here, the specific employer and position the user is viewing, along with a persistent identifier linking that view to the user's device) to Google.

44. Google uses the data it receives from the Platform for its own independent commercial purposes, including to associate the user's job-search activity with the user's identity on Google's own services (including Gmail and Search), to power Google's advertising products, and to refine the user's behavioral profile on Google's platform. None of these uses is disclosed in Bandana's Privacy Policy.

### ii.    The Facebook Tracking Technology.

45. The Facebook Pixel is a tracking pixel developed and operated by Meta Platforms, Inc. that website operators embed on their properties to transmit user-activity data to Meta.

46. The Facebook SDK is its mobile equivalent, a software library that mobile-application developers embed directly into the source code of their applications and that transmits data to Meta's servers, including through Facebook's Graph API endpoint (ep1.facebook.com) and the Facebook collection endpoint at www.facebook.com/tr/.[8]

//

---

[8] *See Meta Pixel, Meta for Developers*, https://developers.facebook.com/docs/meta-pixel/ (last visited Apr. 30, 2026); Facebook SDK for iOS, Meta for Developers, https://developers.facebook.com/docs/ios (last visited Apr. 30, 2026).

CLASS ACTION COMPLAINT

47.    Meta's Pixel and SDK tools collect data about user activity inside the host property and transmit it to Meta's servers, where it feeds into Meta's advertising platform.[9]

48.    The Facebook Pixel and SDK automatically collect and transmit, among other data: (a) a unique Pixel ID ("id") that identifies the property being tracked; (b) a persistent Facebook browser identifier ("fbp") that Meta stores in a first-party cookie on the property and that uniquely identifies the user across sessions; (c) where a Facebook account is associated with the device, a click identifier ("fbc") and the user's Facebook identity; (d) standard Facebook Events including "PageView," "ViewContent," "Search," "Lead," "CompleteRegistration," and "SubmitApplication"; (e) the full URL of the page being viewed ("dl"); (f) the title and description of the page; (g) device and browser fingerprinting data; and (h) the user's IP address.[10]

49.    Once user data is received by Meta's servers through the Pixel or SDK, Meta incorporates that data into its advertising ecosystem and uses it for its own independent commercial purposes, including: (a) Custom Audiences, which allow advertisers to target users who have engaged with specific content on the Platform;

[9] *See Get Started — Meta Pixel, Meta for Developers*, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Apr. 30, 2026) (Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts"); *see also Track Multiple Events with Meta* Pixels, https://developers.facebook.com/docs/meta-pixel/guides/track-multiple-events (describing ow Facebook tracking tools can be designed to track specific user interactions with an app or website) (last visited Apr. 30, 2026).

[10] *See Conversion Tracking — Meta Pixel, Meta for Developers*, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited Apr. 30, 2026); *Meta Pixel, Meta for Developers*, https://developers.facebook.com/docs/meta-pixel/ (last visited Apr. 30, 2026) (data collected includes "Pixel ID and the Facebook Cookie").

-14-

CLASS ACTION COMPLAINT

(b) Lookalike Audiences, which identify users who share behavioral characteristics with Platform users; (c) ad optimization and targeting; and (d) attribution and measurement across Facebook, Instagram, and the Meta Audience Network.[11]

```
GET https://www.facebook.com/tr/?id=2738700523144024&ev=PageView&dl=https%3A%2F%2Fband
ana.com%2Fm%2Fjobs%2F38fa96c7-9d6f-47d7-8958-e85546aed6bb&rl=&if=false&ts=177337001821
1&sw=402&sh=874&v=2.9.277&r=stable&ec=0&o=12318&fbp=fb.1.1773347205996.599577500987825
645&cs_est=true&ler=empty&pmd[title]=Bandana.com%20%7C%20Find%20Better%20Jobs&pmd[loca
le]=en&pmd[description]=Find%20better%20jobs%20with%20Bandana.%20Look%20up%20company%2
accept: image/webp,image/avif,image/jxl,image/heic,image/heic-
sequence,video/*;q=0.8,image/png,image/svg+xml,image/*;q=0.8,*/*;q=0.5
sec-fetch-site: cross-site
referer: https://bandana.com/
sec-fetch-dest: image
accept-language: en-US,en;q=0.9
sec-fetch-mode: no-cors
user-agent: Mozilla/5.0 (iPhone; CPU iPhone OS 18_7 like Mac OS X) AppleWebKit/605.1.15
(KHTML, like Gecko) Version/26.3.1 Mobile/ BandanaApp-Bandana/415E148
priority: u=3, i
accept-encoding: gzip, deflate, br
```

50.    As shown above, Bandana has embedded the Facebook Pixel (id=2738700523144024) on both the desktop and mobile versions of its Platform, including within its mobile application. Network traffic captured from a user's interaction with the Bandana mobile application confirms that, when a user views a specific job listing, the user's device transmits a GET request to https://www.facebook.com/tr/, carrying among other fields:

    a.  id=2738700523144024, which is Bandana's unique Facebook Pixel ID;

    b.  ev=PageView, which identifies the Facebook Standard Event being transmitted;

    c.  dl=https%3A%2F%2Fbandana.com%2Fm%2Fjobs%2F38fa96c7-9d6f-47d7-8958-e85546aed6bb, which is the URL-encoded URL of the

---

[11] *See About Custom Audiences*, https://www.facebook.com/business/help/744354708981227  (last visited Apr. 30, 2026); *About Lookalike Audiences,* https://www.facebook.com/business/help/164749007013531 (last visited Apr. 30, 2026); *Meta Audience Network*, https://www.facebook.com/audiencenetwork/ (last visited Apr. 30, 2026).

-15-

specific job listing being viewed;

    d.  fbp=fb.1.1773347205996.599577500987825645, a persistent Facebook browser identifier that uniquely identifies the user to Meta across sessions and properties;

    e.  pmd[title]=Bandana.com%20%7C%20Find%20Better%20Jobs and pmd[description]=Find%20better%20jobs%20with%20Bandana…, which transmit additional metadata about the page;

    f.  device and application identifiers, including the user agent "Mozilla/5.0 (iPhone; CPU iPhone OS 18_7 like Mac OS X)…BandanaApp-Bandana/415E148" that identifies the Bandana mobile application as the originating application; and

    g.  a referer of https://bandana.com/, confirming that the pixel is being triggered from Bandana's Platform.

51.    This transmission occurs in real time and without any intervening notice to the user.

52.    Every page view of every job listing on Bandana's Platform is mirrored to Meta's servers, together with a persistent identifier that enables Meta to link that view to the user's Facebook, Instagram, and Meta Audience Network identity.

53.    The Facebook Pixel and Facebook SDK are configured throughout Bandana's web properties to transmit additional Facebook Standard Events to Meta, including "ViewContent" (to capture job-listing views), "Search" (to capture searches the user runs on the Platform), "Lead" or "SubmitApplication" (to capture job applications), and "CompleteRegistration" (to capture account signups), each of which is transmitted together with the persistent "fbp" identifier. This configuration enables Meta to construct a chronological record of every search, listing view, and application a user has performed on the Platform.[12]

54.    Meta uses the data it receives from the Platform for its own independent commercial purposes, including to associate the user's job-search activity with the

---

[12] *See Conversion Tracking — Meta Pixel, Meta for Developers*, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited Apr. 30, 2026) ("Standard events are predefined visitor actions that correspond to common, conversion-related activities").

-16-

CLASS ACTION COMPLAINT

user's Facebook or Instagram identity, to power Meta's advertising products (including the Custom Audiences and Lookalike Audiences features), and to refine the user's behavioral profile on Meta's platform. None of these uses is disclosed in Bandana's Privacy Policy.

### iii.    Additional Trackers.

55.    The TikTok App Events SDK (also known as the TikTok Business SDK) is a software library developed and operated by TikTok USDS Joint Venture, LLC., which mobile-application developers embed directly into the source code of their applications.

56.    According to TikTok's own marketing materials, the SDK "enables [developers] to transmit app events, such as Installs, Add to Cart, or Purchases, directly from [their] mobile app to TikTok," creating a "direct first-party connection" that captures "key user actions straight from [the] app" and forwards them to TikTok "in near real-time."[13]

57.    Once user data is received by TikTok's servers through the SDK, TikTok incorporates that data into its own advertising ecosystem and uses it for its own independent commercial purposes, including: (a) the creation of "App Activity Custom Audiences" that allow advertisers to target users based on in-app behavior; (b) Lookalike-style audience expansion; (c) App Event Optimization, Value-Based Optimization, and Mobile App Install optimization of advertising campaigns across the TikTok platform; and (d) attribution and measurement of advertising performance.[14]

---

[13] *TikTok App Events SDK, TikTok for Business*, https://ads.tiktok.com/help/article/about-the-tiktok-app-events-sdk (last visited Apr. 30, 2026).

[14] *See id.* (describing Mobile App Install, App Event Optimization, and Value-Based Optimization); *TikTok App Events SDK*, https://github.com/tiktok/tiktok-business-ios-sdk (last visited Apr. 30, 2026).

-17-

CLASS ACTION COMPLAINT

58.    Bandana has embedded the TikTok Business SDK (version 1.6.0) into its iOS mobile application. Network traffic captured from a user's interaction with the Bandana mobile application confirms that, during ordinary use of the app, the user's device transmits HTTPS requests to TikTok's collection endpoints, carrying among other fields:

a. tiktok_app_id=7618237856632406034, which is Bandana's unique TikTok App ID and identifies Bandana as the advertiser to whom the transmitted data is attributed;

b. app.name=Bandana and app_namespace=com.bandana.Bandana, which identify the originating application to TikTok;

c. anonymous_id=D98CF60D-6ED6-496C-87B2-92D8187DBE2E, a persistent unique identifier assigned by the TikTok SDK that enables TikTok to link every event transmitted from the user's device to a single persistent identity across sessions;

d. idfv=9FFB572A-A11F-42E4-8EB8-40436391A7F1, the Apple Identifier for Vendor, which uniquely identifies the user's device;

e. app_session_id=3FC9A9D2-7094-4832-86B9-BF3BFDD75EE4, a session identifier that allows TikTok to group transmitted events into discrete user sessions and to measure session duration;

f. standard SDK events including "foreground," "background," "ua_init," "ua_end," and "network_req," which disclose when the user opens the Bandana app, when the user backgrounds it, and the latency and duration of the user's session;

g. device and operating-system fingerprinting data, including device model (iPhone18,3), operating-system version (iOS 26.3.1), locale (en-US/US), screen resolution, user agent string identifying the Bandana application ("Bandana/1.0.5"), and the user's IP address (100.89.124.9); and

h. an event_source of "APP_EVENTS_SDK" and a library identifier of "tiktok/tiktok-business-ios-sdk" version 1.6.0, confirming that the transmission is originating from the TikTok Business SDK embedded within the Bandana application.[15]

59.    This transmission occurs in real time and without any intervening notice to the user. Every foreground and background session of the Bandana application is

---

[15] *See TikTok Business iOS SDK*, GitHub, https://github.com/tiktok/tiktok-business-ios-sdk (last visited Apr. 30, 2026) (publishing the tiktok-business-ios-sdk library under the ByteDance/TikTok organization).

CLASS ACTION COMPLAINT

mirrored to TikTok's servers, together with a persistent identifier that enables TikTok to link that session to the user's TikTok identity and device.

60.    On information and good faith belief, Bandana has additionally configured its TikTok Business SDK to transmit additional Standard and Custom Events to TikTok, including events corresponding to account registration, searches the user runs on the Platform, job-listing views, and job-application submissions, each of which is transmitted together with the persistent anonymous_id and idfv identifiers.

61.    This configuration enables TikTok to construct a chronological record of the user's job-search activity on the Platform and to tie that activity to the user's TikTok identity.

62.    TikTok uses the data it receives from the Platform for its own independent commercial purposes, including to associate the user's activity on the Platform with the user's TikTok identity, to power TikTok's App Activity Custom Audiences and App Event Optimization products, and to refine the user's behavioral profile on TikTok's platform. None of these uses is disclosed in Bandana's Privacy Policy.

63.    Bandana also allows Fullstory to record user activities in its Platforms through session replay.

64.    Fullstory is a session-replay and "digital experience intelligence" product operated by Fullstory, Inc. that records user interactions on websites and mobile applications and reconstructs them on Fullstory's servers as video-like playbacks of each visitor's session. According to Fullstory's own technical documentation, the Fullstory script "captures all click events out-of-the-box on any page or screen in which Fullstory is deployed," records DOM mutations and input-change events on form fields, and continuously transmits those events to Fullstory's servers in "bundles" every five seconds via calls to a /rec/bundle endpoint. Fullstory

CLASS ACTION COMPLAINT

also sets a first-party cookie (fs_uid) that allows Fullstory to group sessions belonging to the same anonymous visitor across visits.[16]

65.    Fullstory is active on both the Bandana website and the Bandana mobile application.

66.    Bandana has deployed Fullstory's JavaScript snippet (fs.js) on bandana.com, where it loads on every page of the Platform, initializes a Fullstory "Org" session, sets the fs_uid first-party cookie, and begins capturing the visitor's interactions—including page views, clicks, taps, scrolling, mouse movements, text entered into form fields, and the underlying HTML, CSS, and image assets needed to reproduce the visitor's experience.

67.    Bandana has additionally embedded Fullstory's native mobile-instrumentation SDK in its iOS application, which performs the same capture-and-replay function for in-app screens, taps, and gestures.[17]

68.    Through this deployment, Fullstory receives, stores, and replays a visual reconstruction of every user session on the Platform, including the user's job searches, the listings the user views, the text the user types into search fields and application forms, and the device, browser, IP address, and geographic location associated with the session.

//

---

[16] *See How does Fullstory capture data to recreate my users' experience?*, https://help.fullstory.com/hc/en-us/articles/360032975773 (last visited Apr. 30, 2026); Can Fullstory capture interaction events such as clicks on links or buttons?, Fullstory Help Center, https://help.fullstory.com/hc/en-us/articles/360057051094 (last visited Apr. 30, 2026) ("Fullstory captures all click events out-of-the-box on any page or screen in which Fullstory is deployed.").

[17] *See Get Session Details, Fullstory Developer Guide (Mobile iOS)*, https://developer.fullstory.com/mobile/ios/get-session-details/ (last visited Apr. 30, 2026); *Fullstory Developer Guide*, https://developer.fullstory.com/ (last visited Apr. 30, 2026).

-20-

CLASS ACTION COMPLAINT

69. Fullstory retains those recordings on its own servers, where they are accessible to Fullstory and used by Fullstory to develop, train, and improve its session-replay, "StoryAI," and behavioral-analytics products.[18] None of these uses is disclosed in Bandana's Privacy Policy, and at no point during a user's visit to the Platform does Bandana provide notice that a third party is recording and replaying the user's session in real time.

### C. Bandana Allows Sensitive Information to be Intercepted on their App and Website.

70. The data that Bandana intercepts and transmits through the Tracking Technologies is among the most sensitive data a working adult maintains.

71. The specific combination of fields captured by the Tracking Technologies—persistent identifier, full URL of the job listing, title of the job listing including employer and position, engagement depth, and search and application events—constitutes a comprehensive record of a user's job search.

72. That record discloses, at a minimum: (a) that the user is seeking employment; (b) the user's current industry, seniority, and compensation level (inferable from the listings the user is viewing); (c) the specific employers the user is considering (including, in many cases, the user's current employer's competitors); (d) the user's geographic mobility and commute preferences (inferable from the locations of the listings); and (e) the user's level of active interest in each position (inferable from scroll depth and application activity).

//

//

//

---

[18] *See Getting Started with Session Replay,* https://help.fullstory.com/hc/en-us/articles/360020828573 (last visited Apr. 30, 2026); Session Replay: The Definitive Guide to Capturing User Interactions on Your Website or App, Fullstory, https://www.fullstory.com/blog/session-replay/ (last visited Apr. 30, 2026).

CLASS ACTION COMPLAINT

73.    Job-search information is widely recognized as sensitive. Many job seekers actively conceal their search from their current employers for fear of retaliation or termination.[19]

74.    Disclosure of a user's job-search activity to a data broker or advertising platform creates a durable record of that activity that can be sold, combined with other data sources, and used for purposes ranging from targeted advertising to background investigations to the inference of employment status, financial distress, or health conditions associated with particular industries.

75.    Moreover, the disclosure of Sensitive Information to advertising platforms like Google, Meta, TikTok and FullStory creates a known risk of discriminatory ad targeting. Meta in particular has been the subject of public enforcement actions—including a 2022 settlement with the United States Department of Justice—concerning the delivery of employment advertising in a manner that discriminated on the basis of protected characteristics.

76.    Every additional data point that a platform like Meta receives about a user's job-search activity increases the scope and precision of Meta's ability to deliver—or to withhold—employment advertising to that user.[20]

[19] *See Susan P. Joyce, Confidential Job Search: Finding a Job While Employed,* https://www.job-hunt.org/stealth-job-search/ (last visited Apr. 30, 2026) (cataloging the surveillance-related risks that lead employed job seekers to conceal their search, including employer monitoring of email, Wi-Fi, and work devices).

[20] *See United States v. Meta Platforms, Inc.*, No. 1:22-cv-05187 (S.D.N.Y. June 21, 2022) (consent decree resolving Fair Housing Act claims arising from Meta's targeted-advertising system, under which Meta agreed to develop a Variance Reduction System and to extend that system from housing to employment and credit advertisements, and paid the maximum civil penalty of $115,054 available under the FHA); *see also* Muhammad Ali, Piotr Sapiezynski, Miranda Bogen, Aleksandra Korolova, Alan Mislove & Aaron Rieke*, Discrimination Through Optimization: How Facebook's Ad Delivery Can Lead to Biased Outcomes*, 3 Proc. ACM Hum.-Comput. Interact. art. 199 (CSCW 2019) (documenting significant skew in Facebook's delivery of employment and housing advertisements along

-22-

CLASS ACTION COMPLAINT

77. Not only has Bandana failed to disclose its transmission of user data to Google, Meta, TikTok and Fullstory; Bandana has affirmatively represented, through its Privacy Policy, that sharing of the sort that is in fact occurring does not occur.

78. Bandana's Privacy Policy enumerates a finite list of recipients with whom user data "may" be shared: "Service Providers" (defined as "third-party companies or individuals employed by the Company to facilitate the Service, to provide the Service on behalf of the Company, to perform services related to the Service or to assist the Company in analyzing how the Service is used"); affiliates; "business partners"; "other users" of the Service; and, with respect to any other purpose, only "With Your consent."

79. The Privacy Policy does not identify Google or Meta by name, does not disclose the existence of the Google Analytics tracking code or the Facebook Pixel or SDK on the Platform, and does not disclose that any of a users' Sensitive Information is transmitted to these third parties for advertising purposes.[21]

80. Whereas reasonable users would expect communications made on the Platform to remain private, and whereas Bandana has failed to notify users of third-party advertisers poised to intercept their Sensitive Information, Bandana has allowed Google, Meta, and other third parties to intercept in real time every job-listing view and (on information and belief) every search and application submission on the

gender and racial lines despite neutral targeting parameters).

[21] *See* Bandana *Privacy Policy*, *supra,* n.1. Google's own Terms require website operators not only to disclose their use of Google Analytics, but also to provide users with a "prominent link" to Google's disclosure page explaining "How Google uses information from sites or apps that use our services." *See* Google Analytics Terms of Service, https://marketingplatform.google.com/about/analytics/terms/us/. Similarly, Meta's Business Tools Terms require companies implementing the Meta Pixel, SDK, and related tracking technologies to provide users with "clear and prominent notice" regarding the collection, sharing, and use of their information with "third parties, including Meta." Meta Business Tool Terms, https://www.facebook.com/legal/technology_terms/

-23-

CLASS ACTION COMPLAINT

Platform, together with a persistent identifier that links that activity to the individual user.

81. Once received, Google, Meta, and other third parties do not merely store the intercepted data on Bandana's behalf or use it solely to provide services to Bandana.

82. Rather, Google, Meta, and other third parties use the data intercepted from Bandana's Platform for their own independent commercial purposes, combining it with data collected from across the millions of other websites and applications that have integrated Google Analytics and the Facebook Pixel/SDK to build and refine comprehensive, cross-platform user profiles that are then made available to third-party advertisers.

83. Users of the Platform never contemplated, consented to, or were informed that their Sensitive Information would be used by Google, Meta, and other third parties for these independent commercial purposes—purposes wholly unrelated to the job-search services Bandana provides.

84. At no point during the user's use of the Platform is any user informed that his or her Sensitive Information will be intercepted and transmitted to Google or Meta.

85. To the contrary, Bandana represents to users that their information is kept securely and will be shared only within the narrow categories identified in its Privacy Policy, and only with the user's consent.

86. Bandana did not obtain users' informed consent to the interception and transmission of their Sensitive Information to Google or Meta. The absence of disclosure in Bandana's Privacy Policy is particularly significant because users of a job-search platform have a heightened expectation of privacy regarding their job-search activity.

//

//

-24-

CLASS ACTION COMPLAINT

### D.    Tolling,  Concealment, and Estoppel

87.    Any applicable statute of limitations has been tolled by the  discovery rule. Plaintiff did not know (and had no way of knowing through the exercise of reasonable diligence) of the conduct complained of herein because Defendant actively concealed the true nature of its conduct. The circumstances presented herein would lead reasonable users to believe third parties were not collecting their information or that Defendant was facilitating disclosure of the same. Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her own part. Accordingly, Plaintiff and the Class members could not have reasonably discovered the truth about Defendant's practices until shortly before this class litigation was commenced. Indeed, Plaintiff only became aware of the disclosure of her information in May 2026. Furthermore, under the circumstances Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiff. Defendant therefore is estopped from relying on any statute of limitations.

88.    Alternatively, applicable statutes of limitations have been tolled by other applicable rules or doctrines.

### REPRESENTATIVE PLAINTIFF'S EXPERIENCE

89.    Plaintiff Katherine Gonzalez currently resides (and at all times relevant hereto has resided) in Los Angeles County, California.

90.    On or about June 2025, while living and physically present in California, Plaintiff registered for an account on the Platform and began using the Platform to search and apply for employment opportunities. Plaintiff thereafter used the Platform, through both its web and mobile application experiences, on a regular basis.

91.    During her use of the Platform, Plaintiff provided to Bandana personally identifying information including her name, email address, telephone number, geographic location, and employment history.

-25-

CLASS ACTION COMPLAINT

92.    Plaintiff also viewed, saved, and applied to specific job listings on the Platform, including listings that disclosed the specific employers Plaintiff was considering and the specific positions Plaintiff was seeking.

93.    Throughout Plaintiff's use of the Platform, the Google Analytics tracking code and the Facebook Pixel (and, on Plaintiff's mobile device, the Facebook SDK) embedded within the Platform secretly intercepted Plaintiff's private communications with Bandana—including the specific URLs and titles of the job listings Plaintiff viewed; the searches Plaintiff ran; Plaintiff's scroll and engagement depth on each listing; Plaintiff's device identifiers (including persistent Google Analytics and Facebook identifiers); Plaintiff's IP address; and Plaintiff's device and application information—and transmitted this information to Google, Meta, and other third parties without Plaintiff's knowledge or consent.

94.    At no point before, during, or after using the Platform did Plaintiff consent to Plaintiff's Sensitive Information, personal data, or device identifiers being intercepted and transmitted to Google or Meta as described herein.

95.    Bandana's Privacy Policy did not notify Plaintiff that Plaintiff's interactions with the Platform would be shared with Google or Meta through the embedded Tracking Technologies, and the Privacy Policy's affirmative representations concerning the security of users' communications, the narrow categories of recipients with whom user data would be shared, and the promise that "[w]e may disclose Your personal information for any other purpose **with Your consent**" (emphasis added) constituted affirmative misrepresentations that such sharing would not occur.[22]

96.    Plaintiff was unaware at the time that her information was being captured in real time by the Google Analytics tracking code and the Facebook Pixel/SDK embedded within the Platform and disclosed to Google, Meta, and other

---

[22] *Id.*

-26-

third parties, which combine user data from across the web and mobile applications to create personalized, identifiable advertising profiles.

97. Had Plaintiff known that Bandana was using the Google Analytics tracking code and the Facebook Pixel/SDK to capture Plaintiff's Sensitive Information, and that Google, Meta, and other third parties combine this data with users' broader digital activity to build personalized advertising profiles, Plaintiff would not have used the Platform, would have limited the information Plaintiff provided and the extent of Plaintiff's engagement, or would not have used the Platform on the terms offered.

98. As a direct and proximate result of Bandana's conduct, Plaintiff's privacy rights were violated, and Plaintiff suffered harm in the form of: the unauthorized disclosure of Plaintiff's Sensitive Information to third-party advertising companies; the receipt of unwanted targeted advertisements across Plaintiff's social media and other platforms related to Plaintiff's use of the Platform; loss of control over Plaintiff's private personal data and Sensitive Information; loss of the benefit of the bargain in keeping or exchanging Plaintiff's private data; and other harms related to the undisclosed and non-consensual interception and transmission of Plaintiff's Sensitive Information.

## CLASS ACTION ALLEGATIONS

99. Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

100. Plaintiff seeks to represent the following classes (together, the "Classes"):

**Nationwide Class:**

> All persons in the United States who used the Platform (including www.bandana.com or the Bandana mobile application) during the applicable statutory period and whose data was intercepted and transmitted to third parties by the Tracking Technologies embedded in the Platform.

-27-

CLASS ACTION COMPLAINT

**California Subclass:**

> All persons in the State of California who used the Platform (including www.bandana.com or the Bandana mobile application) during the applicable statutory period and whose data was intercepted and transmitted to third parties by the Tracking Technologies embedded in the Platform.

101. Excluded from the Classes are Defendant, its officers, directors, employees, parents, subsidiaries, affiliates, and legal representatives; any entity in which Defendant has a controlling interest; the judge(s) presiding over this action and their immediate family members and staff; and all persons who have already received or are entitled to receive compensation for the same claims asserted herein.

102. **Numerosity:** The exact number of members of the Classes is unknown but, upon information and good faith belief, is estimated to number in the hundreds of thousands, and individual joinder of these claims is therefore wholly impracticable. Members of the Classes can be readily identified through Defendant's records and objective criteria, and notice can be provided through techniques similar to those customarily used in other class action lawsuits.

103. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendant's wrongful conduct, misrepresentations, concealment, and unlawful practices, and Plaintiff and members of the Classes sustained similar injuries and damages as a result of Defendant's uniform illegal conduct.

104. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with or are antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

CLASS ACTION COMPLAINT

105. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Classes and those questions predominate over any questions that may affect individual members of the Classes. Common questions include, but are not limited to:

    a. Whether Defendant embedded the Google Analytics tracking code and the Facebook Pixel and SDK within the Platform;

    b. Whether those Tracking Technologies intercepted and transmitted Sensitive Information to Google, Meta, and other third parties;

    c. Whether Defendant disclosed those transmissions to users or obtained users' consent;

    d. Whether Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511, 2520;

    e. Whether Defendant violated the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632;

    f. Whether Defendant's Privacy Policy contained material misrepresentations or omissions actionable under New York General Business Law § 349;

    g. Whether Defendant's conduct constitutes intrusion upon seclusion;

    h. Whether Defendant breached its contracts with users;

    i. Whether Defendant was unjustly enriched by intercepting and monetizing users' Sensitive Information; and

    j. Whether Plaintiff and Class members are entitled to damages and injunctive relief.

106. **Superiority:** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that class-wide adjudication will provide a realistic means for members of the Classes to receive monetary relief; the monetary relief suffered by individual members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Classes may be unaware that they have equitable recourse for the conduct alleged herein; and issues common to members of the Classes can be effectively managed in a single proceeding. Plaintiff and counsel know of no difficulty that could be

-29-

CLASS ACTION COMPLAINT

encountered in the management of this litigation that would preclude its maintenance as a class action.

107. **Ascertainability:** Members of the Classes are readily ascertainable through Defendant's own records, which include user account information (including names, email addresses, and mailing addresses) and server logs reflecting users' interactions with the Platform.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. §§ 2511, 2520
### *(On Behalf of Plaintiff & the Nationwide Class)*

108. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

109. The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1)(a), prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication.

110. Plaintiff's and Class members' interactions with the Platform— including the URLs of the job listings they viewed, the titles of those listings, the searches they ran, the applications they submitted, and the engagement data associated with those interactions—constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12) because they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system.

111. Defendant intentionally embedded the Google Analytics tracking code, the Facebook Pixel, and the Facebook SDK within the Platform, which intercepted Plaintiff's and Class members' electronic communications and transmitted the contents of those communications—including the full URLs, titles, and contents of the job listings viewed and applications submitted—to Google, Meta, and other third

-30-

parties in real time, simultaneously with the transmission of those communications between users and Defendant, and without the knowledge or consent of Plaintiff or the Class members.

112. While 18 U.S.C. § 2511(2)(d) provides an exception permitting a party to a communication to intercept that communication, this exception expressly does not apply where the communication is intercepted "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

113. Defendant's interception of Plaintiff's and Class members' electronic communications was undertaken for the purpose of committing the tortious act of invasion of privacy (intrusion upon seclusion), as alleged herein.

114. Specifically, Defendant secretly, and in contravention of its Privacy Policy, embedded the Google Analytics tracking code and the Facebook Pixel and SDK within the Platform to intercept users' Sensitive Information—including the specific employers and positions users were considering—and to transmit that data to Google, Meta, and other third parties for advertising, analytics, and profiling purposes, without users' knowledge or consent.

115. In any event, Google, Meta, and other third parties, in receiving the intercepted communications, act not as mere conduits for Defendant but as independent third-party interceptors for their own commercial purposes.

116. Defendant's conduct was willful and intentional. Defendant deliberately implemented the Tracking Technologies knowing they would intercept users' electronic communications and transmit them to third parties without proper consent, and in contravention of its own Privacy Policy, which represented to users that their information would be treated securely, shared only in narrow circumstances, and otherwise only with their consent.

117. As a direct and proximate result of Defendant's violations of 18 U.S.C. § 2511, Plaintiff and the Class members have been injured and are entitled to relief

-31-

CLASS ACTION COMPLAINT

pursuant to 18 U.S.C. § 2520, including: (a) statutory damages of the greater of $100 per day of violation or $10,000 for each Class member; (b) punitive damages in appropriate cases; (c) a reasonable attorney's fee and other litigation costs reasonably incurred; and (d) such preliminary and other equitable or declaratory relief as may be appropriate.

**COUNT II**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
***(On Behalf of Plaintiff & the California Subclass)***

118.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

119.   Plaintiff brings this claim individually and on behalf of the members of the California Subclass.

120.   California Penal Code § 631(a) establishes liability for any person who:

[I]ntentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

[W]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state,

Or

[U]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

[A]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this

-32-

section.

121. At all relevant times, Plaintiff and California Subclass members were accessing and using the Platform to search and apply for employment. Plaintiff's and California Subclass members' interactions with the Platform constitute communications in transit over a wire, line, cable, or instrument within the meaning of Cal. Penal Code § 631(a).

122. The Tracking Technologies embedded within the Platform constitute unauthorized connections to a wire, line, cable, or instrument and are devices capable of intercepting communications within the meaning of Cal. Penal Code § 631, as they are specifically designed to capture, copy, and transmit user communications as they occur and while they are in transit between the user's device and Defendant's servers.

123. Defendant aided, agreed with, employed, and conspired with Google, Meta, and other third parties to intercept Plaintiff's and California Subclass members' communications by embedding the Google Analytics tracking code and the Facebook Pixel and SDK within the Platform and by configuring those Tracking Technologies to transmit users' Sensitive Information to Google, Meta, and other third parties for these parties' own use.

124. Google, Meta, and other third parties, in turn, willfully and without the consent of all parties to the communications read and learned the contents of Plaintiff's and California Subclass members' communications with Defendant while those communications were in transit, and used the information so obtained for their own independent commercial purposes, including advertising, audience building, and cross-platform profiling.

125. Defendant's interception, and its procurement of Google's and Meta's interception, was accomplished without the consent of Plaintiff or the California Subclass members. Specifically:

    a. Defendant never obtained express consent from Plaintiff or California Subclass members before implementing the Tracking Technologies;

-33-

CLASS ACTION COMPLAINT

b. The Tracking Technologies begin transmitting user data to Google, Meta, and other third parties from the moment a user loads any page of the Platform, before the user has had any opportunity to review the Privacy Policy or to provide informed consent;

c. Defendant never provided clear, conspicuous notice that users' Sensitive Information would be intercepted and shared with Google, Meta, or any other third party;

d. Defendant's Privacy Policy does not disclose the existence of the Google Analytics tracking code, the Facebook Pixel, or the Facebook SDK on the Platform, does not identify Google or Meta by name, and affirmatively represents that sharing occurs only in narrow circumstances and otherwise only with user consent; and

e. Any purported consent was ineffective because the interception began before consent could be obtained and because Defendant's disclosures were inadequate and materially misleading.

126. The intercepted communications include highly sensitive information—the specific employers and positions users are considering, the searches they run, and the applications they submit—that Plaintiff and California Subclass members provided with reasonable expectations of privacy and confidentiality.

127. Defendant's conduct was willful and intentional, as Defendant deliberately implemented the Tracking Technologies knowing they would intercept users' electronic communications and transmit them to Google, Meta, and other third parties without proper consent.

128. As a direct and proximate result of Defendant's violations of Cal. Penal Code § 631, Plaintiff and California Subclass members have suffered injury, including invasion of privacy, loss of confidentiality of personal information, loss of control over their Sensitive Information, and violation of their statutory rights.

129. Plaintiff and California Subclass members continue to desire to use the Platform's services but have a reasonable fear that their communications will continue to be intercepted without consent if they continue to do so.

130. Under Cal. Penal Code § 637.2, Plaintiff and California Subclass members are entitled to:

a. Five thousand dollars ($5,000) per violation;

-34-

CLASS ACTION COMPLAINT

b. Three times the amount of actual damages sustained by the Plaintiff and California Subclass members; and

c. Equitable or declaratory relief, including a preliminary and permanent injunction prohibiting Defendant from continuing its unlawful interception of user communications.

## COUNT III

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 632
### *(On Behalf of Plaintiff & the California Subclass)*

131. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

132. Plaintiff brings this claim individually and on behalf of the members of the California Subclass.

133. California Penal Code § 632(a) provides that:

> [E]very person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished[.]

134. California Penal Code § 632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, or other public proceeding in which the public is entitled to attend, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

135. The communications between Plaintiff and California Subclass members and Defendant through the Platform constitute "confidential communications" within the meaning of Section 632(c).

-35-

CLASS ACTION COMPLAINT

136. Plaintiff and California Subclass members had an objectively reasonable expectation of privacy with respect to those communications, and Defendant created and reinforced the reasonable expectation that users' Sensitive Information is not shared with third parties like Google, Meta, and other third parties by (a) representing in its Privacy Policy that sharing occurs only in narrow, enumerated circumstances; (b) representing that any other sharing occurs only with the user's consent; (c) promising to take "all steps reasonably necessary" to secure user data; and (d) not disclosing the presence of the Tracking Technologies on the Platform.

137. Defendant intentionally used electronic recording devices—specifically, the Google Analytics tracking code, the Facebook Pixel, and the Facebook SDK embedded within the Platform—to eavesdrop upon and record these confidential communications.

138. The Tracking Technologies constitute "electronic amplifying or recording device[s]" within the meaning of Section 632(a) because they are specifically designed to capture, record, and transmit user interactions and communications in real time for analytics and behavioral-tracking purposes.

139. Defendant intentionally implemented and activated these recording technologies within the Platform with full knowledge that they would capture and record users' confidential communications.

140. Defendant's recording of Plaintiff's and California Subclass members' confidential communications was accomplished without the consent of all parties to the communication, specifically:

  a. Plaintiff and California Subclass members never consented to having their confidential communications recorded by the Tracking Technologies;

  b. Defendant never obtained express consent before implementing the recording technologies;

  c. Users were not informed that their communications would be recorded and transmitted to Google or Meta;

-36-

CLASS ACTION COMPLAINT

    d. No clear, conspicuous notice was provided regarding the scope and nature of the recording of confidential communications; and

    e. The recording began immediately upon loading the Platform, before users had any opportunity to review the Privacy Policy or to provide informed consent.

141. Defendant's conduct was undertaken intentionally and with knowledge that the Tracking Technologies would record confidential communications without proper consent from all parties.

142. The confidential communications that were unlawfully recorded include the specific job listings Plaintiff and California Subclass members viewed, the searches they ran, and the applications they submitted—information that reveals the employers and positions Plaintiff and California Subclass members were considering and the nature of their job search.

143. As a direct and proximate result of Defendant's violations of Section 632, Plaintiff and California Subclass members have suffered harm, including invasion of their privacy rights, violation of confidentiality, and loss of control over their sensitive information.

144. Unless enjoined and restrained by this Court, Defendant will continue to commit these violations. Plaintiff and California Subclass members have a reasonable fear that their confidential communications will continue to be unlawfully recorded if they continue to use the Platform.

145. Pursuant to California Penal Code § 637.2, Plaintiff and California Subclass members are entitled to:

    a. A preliminary and permanent injunction prohibiting Defendant from continuing its unlawful recording of confidential communications;

    b. Statutory damages of $5,000 per violation;

    c. Three times the amount of actual damages, if any, sustained by Plaintiff and California Subclass members; and

    d. Any other relief the Court deems proper.

//

-37-

CLASS ACTION COMPLAINT

# COUNT IV

## NEW YORK GENERAL BUSINESS LAW § 349
### *(On Behalf of Plaintiff & the Nationwide Class)*

146. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

147. New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York.

148. Defendant is a "person" engaged in "business, trade or commerce" and in the "furnishing of any service" within the meaning of GBL § 349. Defendant is headquartered in Brooklyn, New York, and its conduct—including the drafting, publication, maintenance, and amendment of its Privacy Policy, the implementation and configuration of the Tracking Technologies on the Platform, and the entry into agreements with Google, Meta, and other third parties pursuant to which those Tracking Technologies transmit user data for Google's and Meta's own commercial use—occurred, originated, or was directed from Defendant's New York offices.

149. Defendant's deceptive acts and practices occurred in New York within the meaning of GBL § 349.

150. Each transaction between Defendant and a user of the Platform, including Plaintiff, was initiated and consummated in substantial part within New York, where Defendant (a) drafted and published the Privacy Policy that misrepresented and omitted material facts about its data-sharing practices; (b) operated and maintained its Platform, Privacy Policy, and tracking infrastructure; (c) received users' Sensitive Information; and (d) caused those communications and data to be retransmitted to Google, Meta, and other third parties.

151. Defendant's conduct is consumer oriented. Bandana markets the Platform to the general public as a free, nationwide job-search service, represents its

CLASS ACTION COMPLAINT

Privacy Policy as applicable to "You"—the individual user—and has caused millions of consumers to register for and use the Platform in reliance on that Privacy Policy.

152. Defendant's Privacy Policy, and Defendant's continued operation of the Platform in a manner inconsistent with that Privacy Policy, are materially misleading. A reasonable consumer acting reasonably under the circumstances, reading Defendant's Privacy Policy, would understand that:

a. User information is shared only with a narrow, enumerated list of recipients—Service Providers processing data on Defendant's behalf, Affiliates, business partners, other users in public areas of the Service, and otherwise only with the user's consent;

b. User data is not transmitted to the world's largest advertising platforms for those platforms' own advertising and profiling purposes;

c. Defendant takes "all steps reasonably necessary" to ensure that user data is treated securely; and

d. Sensitive SMS-related data, in particular, "will not" be sold, rented, loaned, traded, leased, or otherwise transferred or disclosed to "any third party" for "any purpose" other than as necessary to deliver consented-to messages.

153. In truth and in fact, and contrary to these representations:

a. Defendant transmits users' Sensitive Information—including the URLs and titles of the specific job listings users view, users' search queries, users' engagement depth, and, on information and belief, users' application submissions—to Google, Meta, and other third parties, together with persistent identifiers that link that activity to individual users;

b. Google, Meta, and other third parties use the intercepted data for their own independent commercial purposes, including advertising, audience building, and cross-platform profiling, and not merely to provide services to Defendant;

c. Defendant has not taken all steps reasonably necessary to protect user data; it has, to the contrary, affirmatively deployed tools that cause that data to be exposed to and used by Google, Meta, and other third parties; and

d. Defendant's Privacy Policy does not disclose the existence, scope, or operation of these third-party Tracking Technologies, does not identify Google or Meta by name, and does not disclose that users' Sensitive Information is shared with them.

-39-

CLASS ACTION COMPLAINT

154. Defendant's representations and omissions are material because a reasonable consumer would consider the fact that a job-search platform transmits its users' Sensitive Information—including the specific employers and positions users are considering—to Google, Meta, and other third parties for those third parties' own advertising and profiling purposes to be important to his or her decision to use the Platform, to create an account, and to provide the Platform with personal and behavioral information.

155. Defendant's misrepresentations and omissions occurred in connection with Defendant's provision of services within the meaning of GBL § 349. The Privacy Policy is displayed to every user of the Platform, is published from Defendant's New York offices on Defendant's Platform, and is incorporated into Defendant's Terms and Conditions.

156. Plaintiff and Class members were injured by Defendant's deceptive acts and practices. Plaintiff and Class members suffered economic injury in the form of (a) the loss of the benefit of the bargain in providing Sensitive Information to Defendant in exchange for Defendant's promise of confidentiality and secure handling; (b) the unauthorized disclosure of Plaintiff's and Class members' data to Google, Meta, and other third parties, which has economic value and which Plaintiff and Class members would have controlled and, where appropriate, monetized themselves; and (c) the receipt of unwanted targeted advertising derived from their intercepted Sensitive Information. Plaintiff and Class members also suffered non-economic injury in the form of invasion of privacy, loss of control over their Sensitive Information, and the unauthorized construction of advertising profiles incorporating their Sensitive Information.

157. Pursuant to GBL § 349(h), Plaintiff and Class members are entitled to: (a) an injunction prohibiting the deceptive acts and practices alleged herein; (b) their actual damages or $50, whichever is greater; (c) where Defendant's conduct is

-40-

CLASS ACTION COMPLAINT

determined to be willful or knowing, up to three times their actual damages, up to $1,000; and (d) reasonable attorney's fees.

158. Defendant's conduct was willful and knowing. Defendant deliberately implemented the Google and Facebook Tracking Technologies on the Platform, configured them to transmit users' Sensitive Information, and drafted and maintained a Privacy Policy that failed to disclose—and affirmatively contradicted—those transmissions.

## COUNT V

### INTRUSION UPON SECLUSION
*(On Behalf of Plaintiff & the Nationwide Class,
or Alternatively on Behalf of the California Subclass)*

159. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

160. Under the Restatement (Second) of Torts § 652B, one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or her private affairs or concerns, is subject to liability to the other for invasion of her privacy, if the intrusion would be highly offensive to a reasonable person.

161. Plaintiff and Class members had a reasonable expectation of privacy in their interactions with the Platform.

162. The Platform is designed for a deeply personal activity—the search for employment—that carries significant economic, reputational, and psychological implications. Users reasonably expected that their search activity would remain between themselves and Bandana (and, where the user chose to apply, the employer to whom the user applied) and would not be secretly intercepted and transmitted to third-party advertising companies.

163. Defendant's own Privacy Policy reinforced this reasonable expectation of privacy by representing that user information would be shared only with narrow

CLASS ACTION COMPLAINT

categories of recipients and, for any other purpose, only "With Your consent," and by representing that Defendant would take "all steps reasonably necessary" to ensure that user data was treated securely.

164. Defendant intentionally intruded upon the solitude and seclusion of Plaintiff and Class members by secretly embedding the Google Analytics tracking code, the Facebook Pixel, and the Facebook SDK within the Platform and configuring those Tracking Technologies to intercept users' private Sensitive Information—including the URLs and titles of the job listings users viewed, the employers and positions they were considering, the searches they ran, and the applications they submitted—and to transmit that data, alongside persistent unique identifiers, to Google, Meta, and other third parties in real time, without users' knowledge or consent.

165. The intrusion was into a matter that Plaintiff and Class members had a right to keep private. The categories of information intercepted—the identity of employers and positions a user is considering, the fact that the user is searching for a job at all, and the user's detailed engagement with each listing—constitute information whose disclosure can result in material economic, reputational, and professional harm, including retaliation by a current employer, distortion of negotiation leverage, and discriminatory targeting by advertising platforms.

166. Defendant's intrusion would be highly offensive to a reasonable person. The following factors, considered together, establish the highly offensive nature of Defendant's conduct:

    a. The sensitivity of the information intercepted. The data at issue concerns users' employment and career decisions—information that carries significant economic and reputational implications and that can subject individuals to retaliation, discrimination, and exploitation if disclosed.

    b. The context of the intrusion. Users engaged with the Platform in the expectation that they were communicating privately with a job-search service—not broadcasting the details of their employment search to the world's largest advertising companies. The Platform invited users to disclose their career ambitions and, on information and belief, their

-42-

CLASS ACTION COMPLAINT

identities; Defendant exploited that trust by diverting those communications to Google, Meta, and other third parties.

c. The deceptive means of intrusion. Defendant did not merely fail to disclose the interception; it affirmatively represented, through its Privacy Policy, that user data would be treated securely and shared only in narrow circumstances. Users had no reasonable means of discovering the embedded Tracking Technologies or the data transmissions without conducting a technical analysis of the Platform's network traffic.

d. The scope and persistence of the intrusion. The Tracking Technologies intercepted user data continuously—from the moment a user loaded any page on the Platform and throughout every subsequent session—thereby capturing a comprehensive record of each user's job search, including every employer and position considered and, on information and belief, every application submitted.

e. The independent commercial exploitation of the intercepted data. Google, Meta, and other third parties did not merely receive and store the data on Defendant's behalf but incorporated the intercepted communications into their own advertising ecosystems, thereby creating detailed, cross-platform behavioral profiles of individual users, which were then made available to unrelated third-party advertisers for targeted advertising, retargeting, and campaign optimization.

167. Defendant's intrusion was intentional. Defendant made a deliberate business decision to embed the Google Analytics tracking code and the Facebook Pixel and SDK within the Platform, to configure those tools to capture users' private communications, and to enable the transmission of that data to Google, Meta, and other third parties for advertising and analytics purposes—all while representing to users that their data would be treated securely and shared only in narrow circumstances.

168. As a direct and proximate result of Defendant's intrusion upon the seclusion of Plaintiff and Class members, Plaintiff and Class members have suffered damages, including but not limited to loss of privacy, loss of control over their Sensitive Information, the unauthorized construction of advertising profiles incorporating their private communications, the receipt of targeted advertisements derived from their intercepted personal data, and anxiety and emotional distress regarding the unauthorized disclosure of their Sensitive Information.

-43-

CLASS ACTION COMPLAINT

## COUNT VI

### INVASION OF PRIVACY
### *(On Behalf of Plaintiff & the Nationwide Class,*
### *or Alternatively on Behalf of the California Subclass)*

169. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

170. Plaintiff and Class members had a reasonable expectation of privacy in their Sensitive Information on the Platform, which they used to search and apply for employment.

171. Defendant intentionally intruded upon the private affairs of Plaintiff and Class members by secretly embedding the Google Analytics tracking code and the Facebook Pixel and SDK within the Platform, which intercepted and transmitted users' Sensitive Information to Google, Meta, and other third parties without their knowledge or consent.

172. Defendant's intrusion into the private affairs of Plaintiff and the Class would be highly offensive to a reasonable person.

173. Users of a job-search platform have a heightened expectation that their activities within that platform—including the specific employers and positions they are considering, their searches, and their applications—will remain private.

174. As a direct and proximate result of Defendant's invasion of privacy, Plaintiff and Class members have suffered damages, including but not limited to the loss of privacy and the unauthorized disclosure of their private information.

//

//

//

//

-44-

# COUNT VII

## BREACH OF CONTRACT
### (*On Behalf of Plaintiff & the Nationwide Class,*
### *or Alternatively on Behalf of the California Subclass*)

175. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

176. Plaintiff and Class members entered into contracts with Defendant when they registered for and used the Platform, the terms of which are delineated in Defendant's Terms and Conditions and Privacy Policy.

177. As part of those contracts, Defendant agreed to handle users' personal data in accordance with its Privacy Policy—including by sharing user data only with the narrow categories of recipients enumerated in the Privacy Policy, by taking "all steps reasonably necessary" to secure user data, and by refraining from sharing user data for any other purpose except with user consent—and to refrain from disclosing users' data to undisclosed third parties for advertising purposes.

178. Defendant's Privacy Policy represented that user data would not be transmitted to Google or Meta for advertising and analytics purposes.

179. Plaintiff and Class members reasonably relied on Defendant's Privacy Policy in deciding to register for and use the Platform and in deciding to provide Defendant with their Sensitive Information.

180. Defendant breached its contracts with Plaintiff and Class members by secretly transmitting their Sensitive Information to Google, Meta, and other third parties through the embedded Tracking Technologies, in contravention of its Privacy Policy and the reasonable expectations created thereby.

181. As a direct and proximate result of Defendant's breach, Plaintiff and the Class members have suffered damages, including but not limited to the loss of the benefit of their bargain and the unauthorized disclosure of their private information.

## COUNT VIII

### BREACH OF IMPLIED CONTRACT
*(On Behalf of Plaintiff & the Nationwide Class,
or Alternatively on Behalf of the California Subclass)*

182. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

183. Plaintiff pleads this count in the alternative to Count VII.

184. Plaintiff and Class members entered into implied contracts with Defendant when they registered for and used the Platform. As part of those implied contracts, Defendant agreed to handle users' personal data in accordance with its Privacy Policy and to refrain from disclosing users' data to undisclosed third parties for advertising purposes.

185. Defendant's Privacy Policy does not disclose that users' data is transmitted to Google or Meta for advertising and analytics purposes. Plaintiff and Class members reasonably relied on Defendant's Privacy Policy in deciding to register for and use the Platform.

186. Defendant breached the implied contracts with Plaintiff and Class members by secretly transmitting their Sensitive Information to Google, Meta, and other third parties through the embedded Tracking Technologies.

187. As a direct and proximate result of Defendant's breach, Plaintiff and the Class members have suffered damages, including but not limited to the loss of the benefit of their bargain and the unauthorized disclosure of their private information.

## COUNT IX

### UNJUST ENRICHMENT
*(On Behalf of Plaintiff & the Nationwide Class,
or Alternatively on Behalf of the California Subclass)*

188. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

189. Plaintiff pleads this claim in the alternative to Counts VII and VIII.

-46-

CLASS ACTION COMPLAINT

190. Defendant received a benefit from Plaintiff and Class members in the form of their Sensitive Information, which Defendant transmitted to Google, Meta, and other third parties, and in exchange for which Defendant received advertising revenue, analytics services, and other valuable consideration from Google, Meta, and other third parties.

191. Defendant's retention of the benefits conferred by Plaintiff and Class members—namely their Sensitive Information—is inequitable and unjust because Defendant obtained those benefits through the secret interception and transmission of users' private communications without their knowledge or consent, and in contravention of its own Privacy Policy.

192. Plaintiff and Class members are entitled to disgorgement of the revenues and profits Defendant obtained as a result of its unjust enrichment.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Katherine Gonzalez, individually and on behalf of the Classes, respectfully requests that this Court enter judgment against Defendant Workwise Solutions Inc. d/b/a Bandana Jobs and award the following relief:

A. An order certifying the Classes as defined herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Statutory damages under the ECPA, 18 U.S.C. § 2520(c)(2), of the greater of $100 per day of violation or $10,000, whichever is greater, for each Class member, plus punitive damages;

193.

C. Statutory damages under CIPA, Cal. Penal Code § 637.2(a), of $5,000 per violation for each California Subclass member, and treble damages for any actual damages sustained;

D. Statutory and treble damages under New York General Business Law § 349(h), including actual damages (or statutory minimums of $50), treble damages up to $1,000, for Defendant's willful and knowing conduct, and reasonable attorney's fees;

E. Compensatory and consequential damages in an amount to be determined at trial;

F. Disgorgement of Defendant's ill-gotten revenues and profits;

CLASS ACTION COMPLAINT

G. Injunctive relief requiring Defendant to cease the unauthorized interception and transmission of users' data to Google, Meta, and other undisclosed third parties, and to amend its Privacy Policy to accurately disclose its data-sharing practices;

H. Pre-judgment and post-judgment interest as allowed by law;

194.

I. Reasonable attorney's fees and litigation costs pursuant to 18 U.S.C. § 2520(b)(3), Cal. Penal Code § 637.2, and New York General Business Law § 349(h), and

J. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the Classes, hereby demands a trial by jury on all issues so triable.

Dated: June 3, 2026                    Respectfully Submitted,

*/s/ Victor J. Sandoval*

Victor J. Sandoval (SBN 344461)
Lucas Coughlin*
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd., Suite 1121
Los Angeles, California 90034
Telephone: (562) 534-5907
victor@almeidalawgroup.com
luke@almeidalawgroup.com

**Pro hac vice* application forthcoming

*Attorneys for Plaintiff & the Putative Classes*

-48-

CLASS ACTION COMPLAINT